IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KELLY J. POLATIS,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No.  2:10-CR-0364-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court are Defendant's motions for judgment of acquittal.  (Dkt. Nos. 238 and 271).  Defendant argues that the government has not presented sufficient proof to sustain a conviction on the charges brought against him.  For the reasons stated below, the court GRANTS in part and DENIES in part Defendant's motion for a judgment of acquittal.

## BACKGROUND

On December 8, 2010, Defendant was indicted on thirteen counts of murder-for-hire in violation of 18 U.S.C. § 1958(a) and four counts of witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A).  The charges brought against Defendant arise out of a series of telephonic and in-person contacts between Defendant and Agent Greg Rogers ("Agent Rogers"), an undercover FBI agent posing as a professional hit man.  At trial, the government presented evidence that Defendant traveled to at least 4 meetings over a period of 27 days and engaged in at least 7 telephone conversations, all in the context of having Agent Rogers murder several people, including potential witnesses in a federal drug case being brought against Defendant in the

District of Idaho.  No evidence was presented, however, that any money was exchanged between Defendant and Agent Rogers in furtherance of the scheme.

Following the government's presentation of its case, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a).  After hearing arguments on the motion, the court reserved its ruling.  The case was submitted to the jury, which returned a verdict of guilty on ten counts of murder-for-hire and on all four counts of witness tampering.  Shortly thereafter, Defendant filed a renewed motion for a judgment of acquittal which the court now addresses.

## STANDARD OF REVIEW

In deciding a Rule 29 motion, the Court must view all evidence and draw all reasonable inferences in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  That is, the court must "determine whether the evidence, if believed, would establish each element of the crime."  *Id*. at 1081 (citing *United States v. Vallo*, 238 F.3d 1242, 1246-47 (10th Cir. 2001)).  The Court, however, does not consider "the credibility of witnesses and weigh[] the evidence as a thirteenth juror."  *United States v. Ortiz-Ortiz*, 57 F.3d 892, 894 (10th Cir. 1995).   Accordingly, the evidence necessary to support a verdict "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt."  *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999) (quoting *United States v. Parrish*, 925 F.2d 1293, 1297 (10th Cir. 1991)).

<u>ANALYSIS</u>

**I.      MURDER-FOR-HIRE CHARGES**

Defendant moved for acquittal on Counts I to XIII of the government's superseding indictment, which each allege that Defendant violated 18 U.S.C. § 1958, commonly referred to as the murder-for-hire statute.  Superseding Indictment Counts I-VIII (Dkt. No. 86).  The jury found Defendant not guilty on Counts II, IV and V, but convicted him on Counts I, III and VI through XIII.

Defendant argues that he is entitled to acquittal on all of the murder-for-hire charges because the government has failed to present evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that an agreement was reached that was supported by consideration.  The government contends that there was enough evidence presented to allow a jury to find that such an agreement existed.

18 U.S.C. § 1958(a) states that:

> (a) Whoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both . . . .

(2012).  A plain reading of the statute requires only that the government prove "that a defendant traveled in interstate commerce with the intent that a contract murder be committed."  *See United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir. 1990).  *See also United States v. Preacher*, 631 F.3d 1201, 1203 (11th Cir. 2011) ("[O]nce the defendant uses an instrument of interstate commerce with the intent that a murder-for-hire be committed, the crime is completed.); *United States v. Delpit*, 94 F.3d 1134, 1149-50 (8th Cir. 1996) ("Once the interstate-commerce facility is

used with the required intent the crime is complete.  One who travels or causes another to travel in interstate commerce with the necessary murderous intent need not do anything else to violate the statute.").  *Cf. United States v. Bredimus*, 352 F.3d 200, 208-09 (5th Cir. 2003) (holding that federal statute prohibiting interstate travel with intent to engage in illicit sexual conduct did not punish "mere thought" or "mere preparation"); *United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998) (holding that crossing a state line was an act sufficient to justify a criminal conviction).

Despite the statute's plain language, some federal appellate courts have interpreted § 1958 as requiring proof that a defendant did more than just travel or use a facility of interstate commerce, or cause another to do so, with the requisite intent.  The Seventh Circuit, for example, has held that to prove a § §1958 violation, the government must prove that "something of pecuniary value was promised or agreed to be paid in consideration for the murder."  *United States v. Mandel*, 647 F.3d 710, 717 (7th Cir. 2011).  In *United States v. Acierno*, 579 F.3d 694, 701 (6th Cir. 2009), the Sixth Circuit held that "the consideration element of the statute requires a *quid pro quo* between the parties of something of pecuniary value."  *See also United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998) (stating that the language or § 1958 "undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor.").

Defendant argues that the Tenth Circuit's interpretation of § 1958 creates an even higher burden of proof for the government than is required in §other Circuits.  In *United States v. Wicklund*, 114 F.3d 151, 152 (10th Cir. 1997), the Tenth Circuit reversed a murder-for-hire conviction, holding that § 1958 required the government to prove the existence of  "an agreement or mutual understanding supported by consideration."   The Court further held that the term "consideration" as it is used in § 1958 "means consideration in the traditional sense of bargained

4

for exchange." *Id*. at 154.  Therefore, § 1958 criminalizes "payment made either before or after the murder, because both circumstances describe a mutual understanding that something of value will be exchanged for committing a murder." *Id.*

Defendant argues that by requiring proof of "an agreement . . .  supported by consideration" to prove a § 1958 violation, the Tenth Circuit "transports the language of contract into § §1958."  Def.'s Renewed Mot. for J. of Acquittal 13 (Dkt. No. 271).  Defendant argues further that because Agent Rogers consistently required up-front payment before he would commit the planned murders-for-hire, Defendant's promise to pay for the murders in the future was not bargained for and cannot be considered consideration for purposes of § 1958.  *See* Restatement (Second) of Contracts § 71(1) (2012) ("To constitute consideration, a performance or a return promise must be bargained for.").

Defendant misreads the holding in *Wicklund*.  Section 1958 does not require, to establish criminal liability, the existence of an agreement, *i.e.*, meaning there has been a meeting of at least two minds.  Instead, what § 1958 criminalizes is the use of interstate commerce **with the intent** to have a murder-for-hire committed.  The challenge is to distinguish between mere musings or ventings that express exasperation or anger and the requisite intent indicating that the defendant was likely to engage in the criminal conduct.  The Tenth Circuit, in *Wicklund*, was addressing the question of whether the defendant in that case had such requisite intent to support a conviction under § 1958.  In that case, the defendant had made plans to have his wife's ex-husband murdered.  The planned murder, however, was intended to be committed without any pecuniary compensation.  The issue the Court addressed was whether § 1958 required that a defendant intend a murder be committed for a bargained-for payment, rather than some other

pecuniary benefit that was not bargained for.  The Court did not address the question of whether § 1958 required proof of some conduct that exceeded the mere use of interstate commerce.

What *Wicklund* requires, then, is that the government prove that a defendant used interstate commerce with the intent that a murder be committed as bargained-for consideration for the receipt of, or for the promise or agreement to pay, anything of pecuniary value.  In other words, the government must prove that a defendant intended to make a clear agreement to exchange something of value for the commission of a murder.  His conduct then becomes an indication that the intent reflected a real desire to act, not just an expression of frustration or anger.  The fact that an agreement was never formally created pursuant to general principles of contract law does not negate the requisite intent required by § 1958.  *See United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1996) ("[T]he law of contracts regularizes and encourages business transactions, which is the last thing Congress would have wanted to do with criminal transactions.").

Viewing the evidence in the light most favorable to the government, a rational trier of fact could find that the government proved the requisite intent element of § 1958 beyond a reasonable doubt for each of the murder-for-hire counts on which Defendant was convicted. Agent Rogers testified at trial, without objection, that it was his assessment that Defendant was serious about having witnesses killed during the initial meeting between Defendant and Agent Rogers, and that nothing occurred between the initial meeting and Defendant's eventual arrest that caused him to change that assessment.  *See* Trial Tr. on July 13, 2011, p. 361 (Dkt. No. 289). Other evidence relating to the specific counts of the superseding indictment provides additional proof sufficient to allow a jury to find, beyond a reasonable doubt, that Defendant had the requisite intent to be found guilty of a § 1958 violation.

**A.  COUNT I**

Count I of the superseding indictment charges Defendant with traveling in interstate commerce on May 13, 2009 from St. George, Utah, to Las Vegas, Nevada with the intent that the murder of individuals be committed as consideration for a promise and agreement to pay anything of pecuniary value.  At trial, the government presented evidence of a meeting that took place at the MGM Grand Casino in Las Vegas, Nevada on May 13, 2009 between Defendant and Agent Rogers, who was posing as a hit man.   During the conversation, Defendant, while discussing his desire to have certain individuals killed by Agent Rogers, indicated that he could "come up with a hundred grand" within three or four days.  Tr. of Meeting at MGM Casino on May 13, 2009, Ex. 15a, p. 36.  Later in the same conversation, Defendant and Agent Rogers had further discussions about payment and the timing of the proposed murders in the following exchange:

> Defendant:  I'm gonna tell ya right now.
>
> Agent Rogers:  It doesn't exist, can't be traced.
>
> Defendant:  You're gonna have to start on it . . .
>
> Agent Rogers:  Yeah.
>
> Defendant:  (UI) me, and I, I, I can come up with it in about thirty days. (UI) and it'll be paid out within, uh, ninety.
>
> Agent Rogers:  We'd need, we'd need fifty up front just to show you're good, you're fifty percent, not fifty total . . .
>
> Defendant: Right.
>
> Agent Rogers:  Fifty percent up front to show your good intentions . . .
>
> Defendant:  That is not a problem.

Agent Rogers:  Fifty percent when we're done, that's the way we do it, that way we know, uh, we're still business partners and, uh . . .

Defendant:  That's not a problem.

Agent Rogers:  Alright.  I'm thinking we could probably do this whole thing for about thirty, and, uh, so we're not, we're not expensive, we work on, uh, we work on volume, man, so it's, and we stay busy.

Tr. of Meeting at MGM Casino on May 13, 2009, Ex. 15a, p. 64.  Defendant also identified information about the number of individuals and their location later in the conversation:

Agent Rogers:  Okay.  And it, these are four, all four of these, well the four includes the wife, right, the one you were . . .

Defendant:  Five.

Agent Rogers:  Okay, so when I explain this to my people, the, so there's four, one of 'em's the wife, the wife you may, we may wanna . . .

Defendant:  The two guys . . .

Agent Rogers:  Okay.

Defendant:  No, yeah, there's two, no there's six, there's two guys and a wife . . .

Agent Rogers:  Okay.

Defendant:  There's my wife . . .

Agent Rogers:  Okay.

Defendant:  There's, uh, Charlie and his wife.

Agent Rogers:  Okay.

Defendant:  So there's . . .

Agent Rogers:  But the four, four of em are all . . .

8

> Defendant:  There's four couples . . .
>
> Agent Rogers:  All in . . .
>
> Defendant:  There's two couples . . .
>
> Agent Rogers:  Coeur d'Alene except your old lady?
>
> Defendant:  Yeah.
>
> Agent Rogers:  I'm just figuring out where we gotta, we have to be in one town except for your old lady, your old lady's easy, man, I'll, we'll throw you that one as a bone, that's too, that's too simple.

Tr. of Meeting at MGM Casino on May 13, 2009, Ex. 15a, pp. 126-27.

The fact that Defendant initiated the contact with Agent Rogers, arranged for a meeting at a specific time and place, remained at the meeting for a period of more than two hours and had extensive conversations that were primarily focused on the subject of murder-for-hire, is sufficient to allow a rational fact-finder to conclude, beyond a reasonable doubt, that Defendant's intent when traveling from St. George to Las Vegas for the meeting was to make an agreement to exchange something of value for the commission of a murder.  In addition, the jury heard that actual recorded conversation from which it could judge from tone of voice, emphasis and context whether the Defendant's intent was real or simply an expression of frustration.  The jury had evidence from which it could conclude, beyond a reasonable doubt, that the Defendant intended an agreement to hire Agent Rogers to murder the individuals for hire.  The fact that no agreement was formally entered during the May 13, 2009 meeting is irrelevant.

**B.  COUNT III**

Count III of the superseding indictment charges Defendant with causing another to use the telephone, a facility of interstate commerce, on May 17, 2009 with the intent of having a

murder-for-hire committed.   At trial, the government presented evidence of a telephone conversation between Defendant and Agent Rogers that took place on May 17, 2009.  During the conversation, Defendant indicated that he was working on procuring money:

> Defendant:  Yeah, I'm gunna uh, I'm uh, I just, redoing uh, I've decided I wanna go buy a new company . . .
>
> Agent Rogers:  Uh, huh.
>
> Defendant:  And so I got a couple investor puttin' up the dough, so that's what I'm gunna be working on this week and so . . .
>
> Agent Rogers:  Good deal.
>
> Defendant:  . . . the end of this, the end of this week I'll have my money for whatever, so.
>
> Agent Rogers:  Perfect.  Well I tell ya what I'll do.  I will uh, I'll um, why don't you call me at the end of this week and then we'll hook up a time and, like I said, I got business all the time in Vegas. You just tell me when's a good time and I'll head that way.
>
> Defendant:  Okay.
>
> Agent Rogers:  Okay?
>
> Defendant:  And then from here on, so from here I don't wanna even, I don't want John to know nothin' about nothin.'

Tr. of Telephone Call on May 17, 2009, Ex. 18a, p. 6.  While this conversation doesn't explicitly identify an agreement or arrangement between Defendant and Agent Rogers, taken in the context of the series of meetings and discussions that occurred between May 13 and June 9, 2009, a rational trier-of-fact could infer that the discussion was regarding payment of money by Defendant to Agent Rogers for the murder of the individuals identified in the superseding indictment and that the discussion evidenced a real intent to commit murder for hire.

### C.  COUNTS VI & VII

Count VI of the superseding indictment charges Defendant with using the telephone, a facility of interstate commerce, on June 4, 2009 with the intent that a murder-for-hire be committed.  At trial, the government presented evidence of a telephone conversation that took place between Defendant and Agent Rogers.  During the conversation, Defendant indicated that he wanted to meet with Agent Rogers in Las Vegas the next day and a meeting was arranged.  *See* Tr. of Telephone Call on June 4, 2009, Ex. 28a, p. 3.

Count VII of the superseding indictment charges Defendant with traveling in interstate commerce from St. George, Utah, to Las Vegas, Nevada on June 5, 2009 with the intent that a murder-for-hire be committed.  The government presented evidence at trial of a conversation that took place between Defendant and Agent Rogers in Las Vegas on June 5, 2009.  During the June 5th meeting, evidence of the content of Defendant and Agent Rogers conversation reveals that Defendant gave Agent Rogers the names of five individuals.  Tr. of Meeting at BJ's on June 5, 2009, Ex. 29a, p. 37.  The names given to Agent Rogers were C.H., T.H., T.S., B.S. and R.J.  *Id.* Four of the five names[1] given to Agent Rogers match the names of the alleged targets of Defendant's murder-for-hire scheme as identified in the superseding indictment and at trial.

Furthermore, Defendant made specific representations about his plans to pay for the murder of B.S. at the June 5, 2009 meeting:

> Defendant:  Here, here's what I'd like to do.  I'm gonna, I'm gonna write a check to my buddy . . .
>
> Agent Rogers:  Okay.

---

[1] The government identified C.H., K.H., T.S., B.S. and R.J. as the alleged victims of Defendant's scheme.  Neither party disputes that Defendant's reference to T.H. in his conversation with Agent Rogers was actually a reference to the person identified as K.H. in the superseding indictment.

. . . .

Defendant:  I'll have him come down this weekend.

Agent Rogers:  Okay.

Defendant:  I'll write a check, he'll, he's gonna cash it.

Agent Rogers:  Okay.

Defendant:  What do you got to sell for three grand, or four?

Agent Rogers:  You need to buy (laughs) we'll give ya, we'll give you a paper to like a motorcycle or something, and you ride bikes?

Defendant:  Yeah, just whatever, ya know what, I'm gonna, I'm gonna, I'm gonna buy something from ya for forty-five hundred bucks.

Agent Rogers:  We'll give ya, we'll give ya a piece paper looks like you bought something.

Defendant:  But I'm still buying something from ya.

Agent Rogers:  Okay, do you, um, uh . . .

Defendant:  Whatever you guys wanna decide . . .

Agent Rogers:   I'll think of something, okay I'll think of something.

Defendant:  Cuz let me tell ya something.

Agent Rogers:  And we can get paper to make it look right. . . .

Tr. of Meeting at BJ's on June 5, 2009, Ex. 29a, pp. 42-43.  Agent Rogers confirmed Defendant's intention to pay for the murder of B.S. on two more occasions during the June 5, 2009 conversation and during a telephone call following the June 5, 2009 meeting.  *See* Tr. of Meeting at BJ's on June 5, 2009, Ex. 29a, p. 62; Tr. of Telephone Call on June 5, 2009, Ex. 29a-2, pp. 15-16.

The evidence presented at trial was sufficient to allow a rational trier of fact to conclude, beyond a reasonable doubt, that Defendant's June 4, 2009 telephone call to Agent Rogers was done with the intent that an agreement be made to commit a murder-for hire.   While the telephone call at issue in Count VI made no explicit reference to an agreement or plan to have any individuals killed, evidence of the conversation that took place at the meeting on June 5, 2009 is sufficient to allow a rational fact-finder to conclude that the purpose of the June 4, 2009 telephone call was to set up a meeting to discuss plans to have one or more murders committed. Likewise, the evidence of the content of the June 5, 2009 meeting in Las Vegas was sufficient to allow a rational juror to determine that Defendant traveled from St. George to Las Vegas with the intent that an agreement be made to have a murder-for-hire committed.

### D.  COUNT VIII

Count VIII charges Defendant with causing another to travel in interstate commerce from the State of Utah to Las Vegas, Nevada on June 5, 2009 with the intent that a murder-for-hire be committed.  After reviewing the record, this court has not found any evidence that would allow a rational fact-finder to conclude that Defendant caused Agent Rogers or anyone else to travel from the State of Utah to Las Vegas, Nevada on June 5, 2009.

At trial, evidence was presented by the government that Agent Rogers had told Defendant that he was traveling to Phoenix, Arizona on June 2, 2009.  *See* Tr. of Telephone Conversation on June 2, 2009, Ex. 26a, p. 3.  The next day, Agent Rogers left a voice-mail for Defendant indicating that he would be in Las Vegas on June 5, 2009 and hoped to meet there.  *See* Tr. of Message left on Def.'s Voice-Mail on June 3, 2009, Ex. 27a, p. 2.  During the June 4, 2009 telephone conversation between Defendant and Agent Rogers, Agent Rogers informed Defendant that he would be traveling through Las Vegas on June 5, 2009, on his way to Los

Angeles.  *See* Tr. of Telephone Conversation on June 4, 2009, Ex. 28a, p. 2.  There was no evidence presented at trial that Agent Rogers would be traveling from Utah to Las Vegas on June 5, 2009.

Furthermore, even if the government had presented evidence that Agent Rogers had traveled from the State of Utah to Las Vegas, Nevada on June 5, 2009, there was not sufficient evidence presented to allow a rational trier-of-fact to conclude that Defendant caused Agent Rogers to travel in interstate commerce.  In the conversation between Defendant and Agent Rogers on June 4, 2009, Defendant specifically asked Agent Rogers if he was coming to Las Vegas "just to see me[.]"  Agent Rogers answered: "No, f*** no.  I'm driving through, but uh, but . . ."  Tr. of Telephone Conversation on June 4, 2009, Ex. 28a, p. 2.  No other evidence presented about the cause of Agent Rogers travel to Las Vegas.

Viewing the evidence in the light most favorable to the government, the court finds that there was insufficient evidence presented at trial to allow a rational fact-finder to conclude that Defendant caused Agent Rogers to travel from the State of Utah to Las Vegas, Nevada on June 5, 2009 with the intent that a murder-for-hire be committed.  For this reason, the court will grant Defendant's motion for a judgment of acquittal with respect to Count VIII of the superseding indictment.

### E.  COUNTS IX & X

Count IX of the superseding indictment charges Defendant with using the telephone, a facility of interstate commerce, on June 7, 2009 with the intent that a murder-for hire be committed.  At trial, the government presented evidence of a telephone conversation between Defendant and Agent Rogers that took place on June 7, 2009.  During the telephone

conversation, a meeting to be held in St. George, Utah was set up for the following day.   *See* Tr. of Telephone Conversation on June 7, 2009, Ex. 31a, pp. 7-8.

Count X of the superseding indictment charges Defendant with using the telephone on June 8, 2009 with the intent that a murder-for hire be committed.  The government presented evidence at trial that Defendant and Agent Rogers had several telephone conversations on June 8, 2009 leading up to their meeting in St. George, Utah.  *See* Tr. of Telephone Conversations on June 8, 2009, Ex. 32a.

The government also presented evidence that a meeting took place in St. George, Utah on the evening of June 8, 2009.  During the June 8, 2009 meeting, Defendant and Agent Rogers had further conversations about payment for the planned murders:

> Defendant:  Well I gotta check in on (clears throat) on Friday or Thurs, when, when did I call you or Thursday I don't know.
>
> Agent Rogers:  Yeah. I think I saw you on, last Friday wasn't it.
>
> Defendant:  Thursday, I think
>
> Agent Rogers:  Okay.  I can't keep track.
>
> Defendant:  Friday.  It was Friday.
>
> Agent Rogers:  I don't know what [ ] day it is ever.
>
> Defendant:  And it (UI noise) clears tonight.  So once it clears (pause).  That's what I'm trying to think, cause that's my.  I had to collect on this.  It clears tonight.  (Snort)
>
> Agent Rogers:  If you write me a good check tomorrow, I ain't gonna cash I, I won't cash it.
>
> Defendant:  (UI) bud.
>
> Agent Rogers:  Tell when it's good to cash.
>
> Defendant:  (UI) I wanna, I'm thinking about just givin' everything dude.  I'm just.  I mean (chuckles) you know, think about it.

Agent Rogers:  It's up to you man.  It's up to you.  I don't wanna, I don't wanna rush into anything.  You just tell me, you know, when you're good.  (UI) that persons gonna be too [ ] easy.

Tr. of Meeting at Player's Club, Ex. 32a, p. 28.  Defendant and Agent Rogers also arranged another meeting to take place in Las Vegas, Nevada the next day:

Agent Rogers:  . . . You gonna be around tomorrow.

Defendant:  Yeah. (UI) (clears throat) I gotta be here at, my boys doin' a, dude and I don't wanna leave John, but I'm gonna have it tomorrow for sure. (laughs)

Agent Rogers:  Alright.  Yeah, I gotta cause I gotta blow out of here tomorrow, man.

Defendant:  Okay.

Agent Rogers:  I've gotta get to Phoenix.  So what, when, when can.

Defendant:  Probably would, the best way to do is follow me back down to Vegas and we'll (UI)

Agent Rogers:  I could do that.  Yeah, I could do that.

Defendant:  And then you'll take a check that's good.

Agent Rogers:  Well [ ] yeah, if it's good.  Yeah, you don't want to give me a bad check though, man.

Defendant:  (UI)

Agent Rogers:  I know you wouldn't do it.

Defendant:  (UI) f*** that.

Agent Rogers:  Yeah.  I know you wouldn't do that.  So.  That'd be perfect.

Defendant:  I gotta go help my boy in the morning.

Agent Rogers:  Yep.

Defendant:  Do a scout event.  He's got a scout (UI).

Agent Rogers:  (laughs)

Defendant:  I'm gonna do that from to, 7:30 to 9:00

Agent Rogers:  Alright.

Defendant:  And then we're tearing out of here.

Agent Rogers:  Perfect.

Tr. of Meeting at Player's Club, Ex. 32a, pp. 9-10.

While the conversation that took place at the Player's Club in St. George was in person, and therefore cannot be the basis of a charge that Defendant used or caused another to use the telephone with intent that a murder-for-hire be committed, the conversation is evidence from which a rational trier-of-fact could infer Defendant's intent in making the phone calls arranging the June 8, 2009 meeting that are the basis of the charges in Counts IX and X of the superseding indictment.

### F.  COUNTS XI, XII, AND XIII

Count XI of the superseding indictment charges Defendant with causing another to use the telephone, a facility of interstate commerce, on June 9, 2009 with the intent that a murder-for-hire be committed.  The government presented evidence of several telephone conversations between Defendant and Agent Rogers that took place on the morning of June 9, 2009.  In each of these conversations, Defendant and Agent Rogers confirmed their plan to meet in Las Vegas later that day and made arrangements for the time a place of the meeting.  *See* Tr. of Telephone Conversations on June 9, 2009, Ex. 33a.  In one call, Defendant affirmed his plan to pay Agent Rogers for the planned murders that day:

Agent Rogers:  . . . Well, hey uh, where, where can I meet you? I'm gunna go up . . .

Defendant:  Where you gunna be at?  Hey, you want, you want to meet me at that same bar?

Agent Rogers:  Yeah, you just tell me when.  I don't got a whole lotta time though, man.  I really do gotta get rollin'.  So you tell me when to be there and I'll be there.

Defendant:  (UI) Let me ask you a question.

Agent Rogers:  'Kay.

Defendant:  Well, I've still gotta go to the bank, I've gotta run a thing, do you feel comfortably [sic] in me just putting the cash in your account?

Agent Rogers:  I'd feel more comfortable with you puttin' cash in my hand.  I mean, you gotta be able to come up with three thousand bucks, man.  I mean, that ain't nothing.'  So . . .

Defendant:  Well, buddy, I'm tell, I'm tellin' ya right now I'm, I'm, just gotta go to the bank because what happened is, I made a well, it was like a 13, 3, $13,300 deposit last week.

Agent Rogers:  Okay.

Defendant:  What was it, on the day that I saw ya . . .

Agent Rogers:  Yeah.

Defendant:  So, it's supposed to have posted last night, you know, because, Sunday night's not a banking night so Monday night.

Agent Rogers:  Right. Well, you go to the bank, you tell me when to be there, man, and I'll be there.  And then I'll, uh, I'll only be able to stay a little bit.  I gotta . . .

Defendant:  But want you to know, bud, **I ain't playin' games**. I'm, you know, I'm not a, and John knows that.  **I'm not a game player**.  So I . . . (UI).

Agent Rogers:  I know that, man.  That's, that, let me tell ya something.  The only reason, the only reason I have met with you as much as we have is cuz, is because you're a friend of a friend.  I

mean, otherwise, I'd have met with you once, said give me some
[ ] cash and I'd have never seen you again.  But uh. You've
been vouched for and that's good enough for me uh, so, you know . . .

Defendant:  (UI) like but the timing, you know, I just gotta make
sure that this is good and it is because what I was gunna do, the
only reason why I got that much . . .

Agent Rogers:  Yeah.

Defendant:  The 13,700?  Was to do the whole thing.

Tr. of Telephone Conversations on June 9, 2009, Ex. 33a, pp. 6-8 (emphasis added).

Count XII of the superseding indictment charged Defendant with traveling in interstate

commerce from St George, Utah to Las Vegas, Nevada, with the intent that a murder-for-hire

be committed.  Count XIII of the superseding indictment charged Defendant with causing another to

travel in interstate commerce from the State of Utah to Las Vegas, Nevada, with the intent that a

murder-for-hire be committed.   At trial, the government presented evidence of a meeting

between Defendant and Agent Rogers that took place in Las Vegas, Nevada on June 9, 2009.  At

the meeting, Defendant indicated that the check he had deposited in his bank account had not

cleared yet, but that he would be good for the payment.  *See* Tr. of Meeting at BJ's on June 9,

2009, Ex. 29a, pp. 9-10; 13.   After additional discussion, Agent Rogers told Defendant that he

was in a rush and needed to leave, but Defendant delayed him, saying "I wanted to pay you

before you go though."  *Id*. at 69.  Later, Defendant again reaffirmed his commitment to having a

murder-for hire committed:

Defendant:  (Chuckles)  (UI)  Dude, I'm (clears throat) here's what
I want done.  I decided.

Agent Rogers:  Right.

Defendant:  I'm gonna send ya back with three for B__.

Agent Rogers:  Right.

19

> Defendant:  If you can really do this other, I'll send you with
> another five.
>
> Agent Rogers:  Right.
>
> Defendant:  And I'm probably gonna send you with another five.
> So I'm gonna send you with a full thirteen.

*Id*. at 79.   Defendant and Agent Rogers continued to discuss their plans, while Defendant

indicated that he was making arrangements to obtain money to pay Agent Rogers.  At one point,

Defendant informed Agent Rogers that he had contacted his attorney to procure access to funds.

*See Id*. at 128.

After more delays, Agent Rogers attempted to end the meeting, but Defendant urged

Agent Rogers to give him more time:

> Agent Rogers: . . . I gotta cruise.  So I gotta, I can't be late, man.
> If your attorney could come through, I coulda hung out.  But I
> gotta go.  I gotta go, uh . . .
>
> Defendant:  Here, let me make one more call.
>
> Agent Rogers:  Alright.  Yeah.
>
> Defendant:  I want ya to know I'm not (UI) . . .
>
> Agent Rogers:  I know man.  But it's, uh . . .
>
> Defendant:  I know (UI)
>
> Agent Rogers:  Yeah, It's business. . . .
>
> Defendant:  Hey.  Oh, okay.  Bye.  She's on the other (UI)
>
> (Background Conversation)
>
> . . . .
>
> Defendant:  That's the guy that owes me (UI).  You're outta here,
> huh?

Agent Rogers:  I gotta roll, brotha.  Yep, yep, we tried.  It's uh . . .

Defendant:  Now whatta (UI), how do you wanna work it today when I (UI)?

Agent Rogers:  It's . . .

Defendant:  How do you want me to work it?

Agent Rogers:  I recommend you maybe hire somebody else, man.

Defendant:  No.

Agent Rogers:  Yeah, I can't.  I go to, I gotta go to Phoenix.  (UI) I met with you three times and couldn't come up with three grand. That ain't gonna, that ain't gonna sell.

. . . .

Defendant:  You wanted, I'll tell ya what.  I'll call ya in an hour. If I got it, we'll get something worked out.

Agent Rogers:  If you call, I will wait.  Here's what I'm gonna do. It is . . .

Defendant:  I'm gonna take off.

Agent Rogers:  . . . it is three-fifteen.

Defendant:  Here's what I'm gonna do . . .

Agent Rogers:  You call me by four-fifteen.  I'll meet you in like the [ ] parkin' garage, or somethin', and you hand me the cash.  I am, if I don't, if I don't hear from you by . . .

. . . .

Agent Rogers:  . . . four-fifteen, I'm rollin'.

. . . .

Agent Rogers:  I don't wanna meet anybody else.

Defendant:  . . . I'll make sure you have the money.

. . . .

Defendant:  I will make sure, listen to me, I will make sure you have your money.

Agent Rogers:  Alright.

Defendant:  Sometime in the next day.

Agent Rogers:  I don't got a day.  I got an hour.

. . . .

Defendant:  So when I get you the money today, sometime today, and I, if I have to [ ] drive in the morning and come and see ya, I will drive in the morning and make a twelve hour drive there and back.  But I'll get ya the money.  It's six hours from where I live.

Agent Rogers:  Yeah.

Defendant:  If I have to jump in the car and just zip there and zip back I'll make it before curfew.  And I'll do that.

. . . .

Defendant:  Listen to me.  I don't f*** around.  I want ya to know that.  Listen, if I was just leading you on . . .

Agent Rogers:  Yeah.

Defendant:  . . . do you honestly think I'd a taken off and even show my face back here?

Agent Rogers:  No, I know that man, I'm just sayin' if you can't do it . . .

Defendant:  I wouldn't a . . .

Agent Rogers:  . . . if you can't do it, you can't do it.  And that's, I got no problem with that.  You and me we'll just part it and call it even.

Defendant:  But when I got the cash in my hand, I'll call ya.  Cash in my hand.

. . . .

Agent Rogers:  Here's what we'll call it.  We'll do it like this. Don't uh, I ain't callin' you anymore . . .

Defendant:  (UI)

Agent Rogers:  . . . you call me if you got cash in your hand and we'll talk.  If, uh, if you don't got cash in your hand, man . . .

. . . .

Defendant:  Fine.  If I get it worked out, you call me.

Agent Rogers:  No, no, no.

Defendant:  No, I'll call you.

Agent Rogers:  You call me.

Defendant:  Yeah (Chuckles)

Agent Rogers:  Alright man.

Defendant:  Hey!  If anything, (UI)  I just want you to know I'm not playin' you for a fool.

Agent Rogers:  No, that wouldn't be smart.

Defendant:  (UI)

Agent Rogers:  I know, I know you're not that dumb.

Defendant:  Dude, I wouldn't [ ] do that.

Agent Rogers:  Why would ya?

Defendant:  (UI) I need some situations done.

Agent Rogers:  Yeah, you got, you need some stuff taken care of.

Defendant:  It's not, and I gotta do it quick, because somebody's (UI).

Agent Rogers:  You gotta do it real quick because you got, that boy's gonna get out on bond and you don't know where he's gonna go.  You got all kinds of trouble.  So, it's, uh . . .

Defendant:  You know I'm serious, I am scrambling' like a m***********.

Agent Rogers:  Yeah.

Defendant:  Listen.  If I gotta rob the bank [ ] today, (UI).

Agent Rogers:  Yeah.  If you get it in the next hour, that'd be good for you, man.  Call me.

*Id*. at 152-53; 158; 161-66; 168.

The evidence of the content of the telephone conversations and of the discussions had in a meeting between Defendant and Agent Rogers in Las Vegas are sufficient to allow a rational trier-of-fact to conclude that Defendant caused Agent Rogers to use the telephone on June 9, 2009, with a real intent that the agent act to commit a murder-for-hire.  Such evidence is sufficient to allow a fact-finder to determine that the purpose of the telephone call was to confirm and arrange a meeting for Agent Rogers to accept payment for the planned murder. Furthermore, evidence of the content of the calls themselves is sufficient to allow a fact-finder to conclude that Defendant and Agent Rogers were discussing a plan for Defendant to make a payment to Agent Rogers on the telephone.

This evidence is also sufficient to allow a rational juror to conclude that Defendant traveled, and caused Agent Rogers to travel, from Utah to Las Vegas, Nevada with the intent that a murder-for-hire be committed.  The two individuals had met in St. George the previous night and had made specific arrangements to travel to Las Vegas, Nevada so Defendant could deliver payment to Agent Rogers.  Evidence of the content of discussions had between Defendant and Agent Rogers in Las Vegas on June 9, 2009 was also sufficient to allow a juror to conclude that the purpose of the travel of Defendant and Agent Rogers from Utah to Las Vegas was that a murder-for-hire be committed.

## II.   WITNESS TAMPERING CHARGES

The jury also convicted Defendant on Counts XIV, XV, XVI and XVII of the superseding indictment.  Defendant moves for acquittal on each of the counts, which allege that Defendant attempted to kill a federal witness by agreeing to pay to have the witness[2] killed, with the intent to prevent the attendance and testimony of the witness in a trial in the United States District Court for the District of Idaho, in violation of 18 U.S.C. § 1512(a)(1)(A).  *See* Superseding Indictment 7-9 (Dkt. No. 86.)

Defendant attacks his conviction on the witness tampering charges on several grounds. First, Defendant argues that his conviction cannot be sustained because the superseding indictment fails to state a valid offense.  Second, Defendant argues that the government did not present sufficient evidence at trial to prove that Defendant attempted to kill federal witnesses by agreeing to pay to have them killed.  Third, Defendant attacks his conviction on the witness tampering charges on the grounds that the District of Utah was an improper venue for the charges to be brought in.  Finally, Defendant claims that the evidence presented at trial was insufficient to prove that Defendant intended to kill a federal witness to prevent the witness's testimony at an official proceeding.

### A.   Sufficiency of the Indictment

Defendant makes two arguments regarding the sufficiency of the superseding indictment. First, Defendant argues that the indictment does not charge a valid crime because it alleges that Defendant did attempt to kill witnesses by "agreeing to pay" to have the witnesses killed. Defendant argues that an agreement alone can never constitute an attempted killing and,

---

[2] Each count is for the attempted murder of a different witness as follows: Count XIV alleges that Defendant attempted to kill R.J.; Count XV alleges that Defendant attempted to kill T.S.; Count XVI alleges that Defendant attempted to kill K.H.; and Count XVII alleges that Defendant attempted to kill C.H.

therefore, the allegations in the superseding indictment are inadequate, as a matter of law, to state a violation of § 1512(a)(1)(A).  Second, Defendant argues that even if an agreement to pay to have someone killed is sufficient by itself to constitute an attempt, the structure of § 1512 shows that Congress did not intend that § 1512(a)(1)(A) make a party criminally liable for merely making an agreement to pay to have someone killed.

Defendant's attacks on these counts of the superseding indictment rely on the assertion that the language of the witness tampering charges required the government to prove, beyond a reasonable doubt, that Defendant agreed to have specific witnesses killed, and that the agreement constituted an attempt to kill federal witnesses.  *See* Def.'s Renewed Mot. for J. of Acquittal 4 (Dkt. No. 271.)  The government responds that the superseding indictment's reference to an agreement is a surplusage that can be ignored by the court because it is a non-essential factual averment that goes beyond alleging the elements of the offense.  *See* Gov.'s Mem. Opp. Mot. for J. of Acquittal 7 n.5 (Dkt. No. 258.)  The determination of whether the superseding indictment's references to an agreement require the government to prove that Defendant attempted to kill federal witnesses by agreement or some other conduct rests on whether a variance from the language of the witness tampering charges at trial would constitute a constructive amendment of the indictment or a simple variance.

It is a fundamental precept of the federal constitution that a defendant cannot be tried on charges that are not made in the indictment against him.  *See Stirone v. United States*, 361 U.S. 212, 217 (1960).  Thus, when a district court's jury instructions and the proof offered at trial broaden an indictment, a constructive amendment to the indictment is made and a conviction on the charge is reversible *per se*.  *See United States v. Sells*, 477 F.3d 1226, 1237 (10th Cir. 2007).  More specifically, a variance becomes fatal and reversible when "the defendant is prejudiced in

his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." *United States v. Pritchard*, No. 03-1155, 86 F.App'x 387, 389 (10th Cir. Jan. 23, 2004) (unpublished) (citation omitted).

A simple variance, on the other hand, occurs when "the evidence adduced at trial establishes facts different from those alleged in the indictment." *Sells*, 477 F.3d at 1237 (citation omitted). Where only a simple variance exists, "convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." *Hunter*, 916 F.2d at 599 (citing *United States v. Miller*, 471 U.S. 130, 136 (1985). Courts apply harmless error analysis to simple variances to determine whether the variance substantially prejudiced the defendant's rights. *Sells*, 477 F.3d at 1237.

Though it may be difficult to distinguish between variances that constitute constructive amendments to the indictment and simple variances, the Tenth Circuit has indicated that the important distinguishing factor is whether the variance "actually modifies an essential element of the indictment." *Hunter*, 916 F.2d at 599. For a variance to require a jury verdict to be set aside, it "must be more than the addition or deletion of nonessential factual averments." *Id*.

The existence of an agreement between the defendant and another party is not an essential element of the crime of witness tampering. Section 1512(a)(1)(A) only requires proof (1) that a defendant killed or attempted to kill another person and (2) that the defendant did so with intent to prevent the attendance or testimony of any person in an official proceeding. When a § 1512(a)(1)(A) violation is charged on the basis of an attempted killing, the government must prove (1) that the defendant intended a killing to be accomplished and (2) that a substantial step towards the completion of the killing has occurred. *See United States v. Washington*, 653 F.3d 1251, 1264 (10th Cir. 2011). References to an agreement in the indictment are merely

nonessential factual averments, making the alleged variation Defendant cites only a simple variance.

Furthermore, any variance between the superseding indictment's references to an agreement and the evidence that was presented at trial would not substantially prejudice defendant's rights. As referenced above, the danger presented by a variation between the allegations in an indictment and the evidence presented at trial is that a defendant may not be able to anticipate what evidence would be presented against him or that a defendant may be exposed to the risk of double jeopardy. *See Pritchard*, 86 F.App'x at 389. The risk of double jeopardy is not at issue in this case.

Also, the reference in the superseding indictment to an agreement in this case would not have put Defendant at risk of being confronted with unanticipated evidence at trial. All the evidence presented against Defendant in this matter related to the conversations, plans and promises made to Agent Rogers in furtherance of an alleged scheme to have several individuals killed, including potential witnesses in a federal proceeding. The government's theory of liability did not depend on evidence of conduct that was engaged in outside the context of Defendant's plans to hire a hit man. Even if the government's evidence was insufficient to prove that an agreement to have witnesses killed was actually consummated, the evidence presented was not the type of evidence that would not be anticipated by Defendant in this case. References to an agreement in the indictment did not substantially prejudice Defendant's rights and any variance from the government's allegation that Defendant entered into such an agreement is harmless error that the court will ignore.

Because a variance from the superseding indictment's allegation that Defendant entered an agreement to pay to have federal witnesses killed would constitute only a harmless simple

variance, the court can properly ignore the allegation of an agreement as a non-essential surplusage. For this reason, Defendant's attacks on the sufficiency of the superseding indictment must fail. The superseding indictment properly alleged the essential elements of a § 1512(a)(1)(A) violation. The witness tampering charges are not defective merely because they allege additional facts that do not improperly broaden the scope of the crime.

### B.   Insufficient evidence of attempt

Beyond the argument that the witness tampering charges, as stated in the superseding indictment, are defective, Defendant also argues that the government has failed to present sufficient evidence to allow a rational fact-finder to conclude, beyond a reasonable doubt, that Defendant attempted to kill the specific witnesses identified in the superseding indictment. Specifically, Defendant claims that the evidence at trial was insufficient to prove that Defendant took a substantial step towards having the witnesses killed.

To prove an attempted killing, the government must show that Defendant (1) had the intent that an individual be killed and (2) committed "an act which constitutes a substantial step towards the commission" of the killing. *See United States v. Irving*, 665 F.3d 1184, 1195 (10th Cir. 2011) (citation omitted). The determination of whether a defendant's actions amount to an attempt is a highly fact-specific inquiry and must be engaged in on a case-by-case basis. *Id.* A substantial step must be something more than mere preparation, but may be less than the last act necessary before the actual commission of the substantive offense. *Id.* at 1196 (citations omitted). "The fact that further, major steps remain before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." *Id.* (quotation marks and citation omitted).

Because of the fact-specific nature of the substantial step inquiry, references to other attempt cases are often unhelpful.  *See Id*. (citing *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996) ("The decisions are too numerous to cite and would not help much anyway, for there is, and obviously can be, no definite line between preparation and attempt.")).   The Tenth Circuit, however, has often referenced the Model Penal Code's definition of "Criminal Attempt" to determine whether a defendant has engaged in a substantial step.  *See Id*.; *United States v. Haynes*, 372 F.3d 1164, 1169 (10th Cir. 2004); *United States v. Prichard*, 781 F.2d 179, 181-82 (10th Cir. 1986).  Under the Model Penal Code, an act cannot constitute a "substantial step" for purposes of criminal attempt charges unless "it is strongly corroborative of the actor's criminal purpose."  MODEL PENAL CODE § 5.01(2) (2011).  To further inform as to the nature of the required proof, the Model Penal Code lists several acts that "if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law":

> (a) lying in wait, searching for or following the contemplated victim of the crime;
>
> (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;
>
> (c) reconnoitering the place contemplated for the commission of the crime;
>
> (d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;
>
> (e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;
>
> (f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

*Id*.

The Tenth Circuit has relied on § 5.01's list of not "insufficient" activities to determine that evidence that a defendant possessed materials useful in the manufacture of methamphetamine was sufficient to allow a jury to conclude, beyond a reasonable doubt, that the defendant had taken a substantial step towards the manufacture of methamphetamine. *Haynes*, 372 F.3d at 1169. *See also Prichard*, 781 F.2d at 181-82 (relying on the list in § 5.01 to determine that evidence that defendant collected items necessary to commit a bank robbery was sufficient to allow a jury to conclude that defendant took a substantial step towards committing the robbery).

While the Model Penal Code includes "soliciting an innocent agent to engage in conduct constituting an element of the crime" in its list of activities that may constitute a substantial step if strongly corroborative of a defendant's criminal purpose, the Tenth Circuit has never explicitly held that solicitation alone can be a substantial step for the purposes of criminal attempt. MODEL PENAL CODE § 5.01(2)(g). In *United States v. Cornelio-Pena*, 435 F.3d 1279, 1286-87 (10th Cir. 2006), however, the Tenth Circuit recognized that "[i]n many jurisdictions, soliciting another person to engage in criminal conduct can satisfy the substantial step requirement for an attempt." (citation omitted). The Court stated, *in dicta*, that "although the *actus reus* requirement for an attempt must go beyond mere preparation, it need not be a greater act than that required for solicitation." *Id*. Thus, the Tenth Circuit has left open the possibility that solicitation alone may, in an appropriate context, satisfy the requirement for a substantial step.

In *United States v. Rothenberg*, 610 F.3d 621, 626-27 (10th Cir. 2010), the Tenth Circuit held that a defendant took a substantial step towards inducing a minor to engage in criminal

sexual activity when he used the internet to arrange a sexual encounter with a minor.  *See also United States v. Thomas*, 410 F.3d 1235, 1246 (10th Cir. 2005) ("Thomas crossed the line from 'harmless banter' to inducement the moment he began making arrangements to meet [the victim], notwithstanding the lack of evidence that he traveled to the supposed meeting place.") The Court stated that "whether a given activity or course of conduct amounts to a substantial step toward the commission of a crime is a question of fact that will vary from case to case depending not only upon the activity or course of conduct itself, but also upon the nature of the underlying offense to which the attempt is tied."  *Id*. at 627.  Because the "nature of the underlying offense . . . necessarily contemplate[d] oral or written communications as the principal if not the exclusive means of committing the offense," the words of the defendant alone were enough to sustain the defendant's attempt conviction.

The government in this case submitted evidence at trial that is sufficient to allow a rational trier-of-fact to conclude, beyond a reasonable doubt, that Defendant at least solicited Agent Roger's services to kill the witnesses identified in the superseding indictment.  Evidence of conversations between Defendant and Agent Rogers indicate that Defendant initiated a conversation with Agent Rogers regarding the killing of the witnesses identified in the superseding indictment during their first meeting at the MGM Grand in Las Vegas on May 13, 2009.  *See* Tr. of Meeting at MGM Casino on May 13, 2009, Ex. 15a, pp. 35-36.  In that same conversation, the evidence shows that Defendant indicated that he could "come up with a hundred grand" within three or four days if needed.  *Id*. at 36.  Later in the same meeting, Defendant and Agent Rogers discussed the cost of having witnesses killed, indicating specific pricing and when payment was to be made, and Defendant gave Agent Rogers information about the location of the witnesses and their relationship to a federal case pending in the District of

Idaho. *Id*. at 40, 126. From this and other evidence, a rational trier-of-fact could conclude that Defendant solicited Agent Rogers to kill the federal witnesses identified in the superseding indictment.

Like the underlying offense addressed by the Tenth Circuit in *Rothenberg*, hiring a hit man to have an individual killed is an offense that "necessarily contemplates oral or written communications as the principal if not the exclusive means of committing the offense." Indeed, in many murder-for-hire situations, negotiation by oral or written communication may be the only conduct the person hiring the hit man engages in, apart from transferring money to the hired killer. It is clear that a defendant can be held liable for witness tampering under § 1512(a)(1)(A) by hiring someone to commit a killing, even if the defendant never intends to take the life of another directly by his own physical actions. *See, e.g., Washington*, 653 F.3d 1251; *Irving*, 665 F.3d 1184. Because oral and written communication is the primary means of hiring an agent to have another killed, it cannot be the case that the government would be required to prove any physical conduct beyond oral or written solicitation of a hit man to prove that Defendant attempted to hire another to kill federal witnesses. The critical factors in the analysis must focus on the purpose of the substantial step requirement—in the context of the facts presented, did the conduct strongly corroborate the actor's criminal purpose?

While the court accepts that evidence of solicitation would be sufficient to show a substantial step towards the commission of a killing when the killing is to take place at the hands of a hit man hired by the defendant, the court's decision to sustain Defendant's conviction on the witness tampering charges does not rest on the evidence of solicitation alone because the government has presented evidence that Defendant's conduct went far beyond solicitation. Following the initial lengthy meeting between Defendant and Agent Roger's in Las Vegas,

Defendant and Agent Rogers had continuing conversations about the scheme to have federal witnesses killed on at least ten different occasions.  Defendant traveled from St. George, Utah to Las Vegas, Nevada to meet with Agent Rogers in connection with the scheme on at least three different occasions.  The jury reviewed the content of the discussions that occurred during those meetings and could assess whether Defendant maintained his intent to have the identified witnesses killed.  *See* Trial Tr. on July 13, 2011, p. 361 (Dkt. No. 289.)  During a meeting between Defendant and Agent Rogers held in Las Vegas on June 5, 2009, Defendant identified the potential targets of the murder for hire scheme by name, including the witnesses named in the superseding indictment.[3]  *See* Tr. of Meeting at BJ's on June 5, 2009, Ex. 29a, p. 37.  On numerous occasions, Defendant expressed a commitment to pay Agent Rogers to have the witnesses killed.  During the final meeting between Defendant and Agent Rogers, prior to his arrest, Defendant made several efforts to delay Agent Roger's departure, claiming his procurement of funds was imminent.  *See* Tr. of Meeting at BJ's on June 9, 2009, Ex. 23a, pp. 117, 128, 152-53, 158, 161-66, 168.

        Even if there were no evidence that Defendant did any single act that would have constituted a substantial step by itself, when taken in context and in the aggregate, the evidence of Defendant's conduct during the negotiations with Agent Rogers is strongly corroborative of Defendant's intent that the witnesses identified in the superseding indictment be killed.  *See* *Washington*, 653 F.3d at 1266 ("Although this is not necessarily the type of evidence which, *on*

_____

[3] In oral arguments, Defendant's counsel made much of the fact that Defendant only gave the names of the potential victims orally, and did not write the names down himself.  According to Defendant, the fact that he did not engage in the act of writing the names down precludes the court from relying on his communication of the names to Agent Rogers as a substantial step towards the commission of a killing.  There is no substantive difference between communicating the names of potential victims in a murder-for-hire scheme orally, as opposed to in writing.  The court will not set aside Defendant's conviction on such an insignificant distinction.

*its own*, indicates a substantial step, it does, when taken in context, provide additional, corroborating evidence of Mr. Washington's intent to commit the crime.") (emphasis in original).  From the evidence presented, the jury could reasonably conclude that had Agent Rogers been an actual hit man, and not an undercover law enforcement agent, the only step left uncompleted in Defendant's effort to have witnesses killed was his payment of the fee requested by Agent Rogers.  *See cf.*, *United States v. Bunney*, 705 F.2d 378, 382 (10th Cir. 1983) (finding defendant had taken a substantial step by hiring someone to destroy a building with explosives, even though no payment had been exchanged, because "[defendant] had completed his participation in the destruction of the Rompoon Saloon; he would have done no more had Jerome actually carried out the plan.").  Defendant's repeated contacts and meetings with Agent Rogers in which the discussed focus and purpose of the conversation was to persuade Agent Rogers to accept the assignment were sufficient to allow the jury to conclude that if Defendant had had the means to make the payment required by Agent Rogers, he would have, thus corroborating his intent to have the murders committed by Agent Rogers and making his conduct in the negotiations of the scheme a "substantial step" towards the completion of the killings.

To the extent the existence of an agreement is corroborative of Defendant's intent to have witnesses killed, the court also finds that the government presented sufficient evidence to allow a jury to find that an agreement to pay to have witnesses killed did exist between Defendant and Agent Rogers.  While the court does not believe principles of contract law are always helpful when judging the conduct of parties in a murder-for-hire context,[4] and neither the government nor Defendant argue that a binding contract between Defendant and Agent Rogers existed in this

---

[4] *See e.g.*, *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998) ("An agreement to commit a crime is unenforceable, so it is ridiculous to speak of enforceable, binding contracts to commit crimes.")

case, the Restatement (Second) of Contracts can be instructive when deciding whether two parties entered into an agreement or not.

According to the Restatement, an agreement is "a manifestation of mutual assent on the part of two or more persons." RESTATEMENT (SECOND) OF CONTRACTS § 3 (2012). Importantly, comment 'a' to the same section explains that the word "agreement" "contains no implication of mental agreement." *Id*. at cmt. 'a.' In other words, an agreement is made when two or more parties make an objective indication to be bound to a promise. Such a "manifestation of mutual assent" can be made in writing or by oral communication or conduct. In the context of an undercover officer posing as a hit man, the officer is never going to have the "mutual" intent to agree to complete the murder for hire. Thus, the focus must be on the Defendant's conduct, both verbal and non-verbal, to determine whether he assented to an agreement to kill witnesses if the facts were as he believed them to be.

Defendant argues that because Agent Rogers consistently indicated that he would not kill any of the potential victims of the murder-for-hire scheme until he received payment from Defendant, no agreement could exist until payment was made. A party offering to make an agreement may make acceptance of the contract conditional on some event occurring or not occurring. *See* RESTATEMENT OF CONTRACTS § 36(2) (2012). If such a "condition of acceptance" is required, an agreement is not made until the condition is met. Defendant argues that payment was a condition of acceptance in this case.

Agent Rogers' up front payment requirement, however, may also be viewed as a mere condition for performance. A condition for performance of a contract is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." RESTATEMENT (SECOND) OF CONTRACTS § 224 (2012). The existence of

a condition for performance does not negate the existence of a contract.  In fact, under contract law, an event is not usually referred to as a condition unless a contract exists.  *See Id*. at cmt. 'c' ("In order for an event to be a condition, it must qualify a duty under an existing contract.").

The distinction between a condition of acceptance and a condition for performance turns on whether an agreement between the parties exists or not.  For this reason, Defendant's argument that Agent Rogers required payment before he would kill the potential victims is unhelpful.  The existence of an agreement depends upon whether Defendant manifested what he believed to be mutual assent between himself and Agent Rogers that the scheme be completed, not on whether Defendant was required to pay first or Agent Rogers was required to kill first.  To prove an agreement, the government was required to show that Defendant made an objective manifestation of his intent to pay to have the witnesses killed and that Agent Rogers made an objective manifestation of his intent to kill the witnesses if he received payment from Defendant. From the evidence already reviewed in this opinion, it is clear that the evidence presented at trial was sufficient to allow a rational fact-finder to conclude, beyond a reasonable doubt, that such an agreement was made.

## C.    Venue

Defendant also attacks his conviction on the witness tampering charges on the grounds that the charges were brought to trial in an improper venue.  Specifically, Defendant argues that the government was required to show at trial that the Defendant took a substantial step towards having witnesses killed in the federal district where the charges against him were filed, and that no substantial step was taken in the District of Utah.  The government argues that the evidence at trial was sufficient to prove that Defendant took a substantial step in the District of Utah and,

alternatively, that it was only required to prove that Defendant began, continued or completed his criminal activity in the District of Utah.

"[V]enue is a right of constitutional dimensions, [which] has been characterized as an element of every crime." *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997). "Venue in federal criminal cases is an element of the prosecution's case which must be proved, unlike the other elements, by a preponderance of the evidence." *Id*. at 749-50. As a general principle, venue is proper in the district where the offense was committed. *See* U.S. Const. art. III, § 2, cl. 2 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."). Where an offense takes place in more than one judicial district, venue is generally proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). This general venue rule, however, is not applicable where "otherwise expressly provided by enactment of Congress." *Id.*

Such an exception to the general venue rule is contained in the witness tampering statute that Defendant is charged with violating in this case. 18 U.S.C. § 1512(i) limits the venue for bringing charges under § 1512 to (1) "the district in which the official proceeding . . . was intended to be affected" or (2) "the district in which the conduct constituting the alleged offense occurred." (2012). In attempt cases, the Tenth Circuit has held that venue rules require the government to prove that the defendant took a substantial step towards the completion of the substantive offense in the district where the charges are being brought. *See United States v. Foy*, 641 F.3d 455, 468 (10th Cir. 2011). In *Foy*, the Court vacated a defendant's conviction on an

attempt charge bought in the District of Kansas because there was "absolutely no evidence that [the defendant] committed any act in the District of Kansas." *Id.* at 467.

While *Foy* did not purport to interpret the meaning of § 1512(i), Defendant argues that § 1512(i), in conjunction with *Foy*, requires the government to present evidence sufficient to prove that Defendant committed an act that would constitute a substantial step towards having witnesses killed in the District of Utah.

The government argues, in contrast, that while it is clear that some conduct towards the completion of the substantive offense must have taken place in Utah, § 1512(i) and *Foy* do not require that the entire substantial step took place in Utah. As support for their position, the government cites the general venue rule that allows prosecution in "any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237. The government argues that under Defendant's interpretation of § 1512(i), there would be no proper forum in cases where a substantial step is inferred from a defendant's conduct in the aggregate and the conduct took place in multiple states.

While the court agrees with Defendant that the general venue rules in § 3237 is inapplicable to the issue of venue in this case, the court also agrees with the government that, at least where a substantial step is to be inferred from a defendant's conduct in the aggregate, venue is proper in any federal district where Defendant engaged in conduct that could properly be said to have materially contributed to the inference that Defendant took a substantial step towards the completion of the underlying substantive offense.

This understanding of § 1512(i) does not contradict the Tenth Circuit's opinion in *Foy*. In *Foy*, the government had presented no evidence that the defendant had engaged in any conduct in the District of Kansas. The government's theory of venue, which the Tenth Circuit

rejected, was that the defendant's co-conspirator initiated the attempted crime in Kansas and that his conduct should be imputed to the defendant.  The Tenth Circuit stated, "[w]hile it was entirely proper for the district court to impute the acts of Mr. Wesley to [the defendant] for purposes of establishing venue for the conspiracy charge, the government does not cite a single case suggesting that such imputation is proper to establish venue for the attempt charge."  *Foy*, 641 F.3d at 467.

The facts addressed by the Court in *Foy* are inapposite to the facts in this case.  In this case, the government provided evidence that Defendant engaged in material conduct towards the consummation of the murder-for-hire scheme at issue in the State of Utah.  Defendant lived in the District of Utah and was under a court order to return to his home in Utah each evening.  *See* Order Setting Conditions of Release, Gov't Ex. 7.  Defendant initiated or engaged in multiple telephone conversations with Agent Rogers while in the District of Utah, and traveled from Utah to Las Vegas, Nevada on at least three occasions to meet with Agent Rogers in furtherance of the murder-for-hire scheme.  On June 8, 2009, Defendant met with Agent Rogers in the District of Utah to discuss the murder-for-hire scheme.  During that meeting, Defendant confirmed his intent to pay for the murders and made a plan to travel with Agent Rogers to Las Vegas the next day to obtain funds for the payment.  *See* Tr. of tape recording of June 8, 2009 telephone contacts and meeting, Ex. 32a, pp. 28, 66.

From this evidence, a rational trier-of-fact could reasonably conclude, by a preponderance of the evidence, that Defendant engaged in conduct in the District of Utah that would contribute to the inference that Defendant's conduct in the aggregate constituted a substantial step towards having the witnesses identified in the superseding indictment killed.  Moreover, evidence of Defendant's conduct in the District of Utah is strongly corroborative of

Defendant's intent to have the witnesses killed. A rational trier-of-fact could also conclude that venue was proper in the District of Utah under Defendant's interpretation of § 1512(i).

### D. Insufficient evidence of intent

Defendant's final challenge to his conviction on the witness tampering charges is that the government did not present sufficient evidence at trial to prove Defendant's intent that the witnesses named in the superseding indictment be killed. To prove an attempt, the government is required to show that Defendant (1) had the intent that an individual be killed and (2) committed "an act which constitutes a substantial step towards the commission" of the killing. *See United States v. Irving*, 665 F.3d 1184, 1195 (10th Cir. 2011) (citation omitted).

As mentioned previously, the substantial step element of an attempt offense requires a showing that defendant engaged in conduct that is "strongly corroborative" of a defendant's criminal purpose. *See* MODEL PENAL CODE § 5.01(2) (2011). Because the court has already found that the evidence presented at trial was sufficient to allow a rational fact-finder to conclude that Defendant engaged in a substantial step towards having the witnesses identified in the superseding indictment killed, it necessarily follows that the government's trial evidence was sufficient to prove that Defendant had the intent that an individual be killed.

### CONCLUSION

For the reasons stated above, the court hereby DENIES Defendant's motion for judgment of acquittal (Dkt. Nos. 238 and 271) on Counts I-VII and Counts IX-XVII of the superseding indictment (Dkt. No. 86) and GRANTS Defendant's motion for judgment of acquittal with respect to Count VIII of the superseding indictment.

DATED this 3rd day of August, 2012.


BY THE COURT:


Clark Waddoups
United States District Judge